United States District Court
Southern District of Texas

**ENTERED**

March 27, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CONTEGO SPA DESIGNS, INC., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 23-1173 |
| | § | |
| T-SPA MFG., LLC and T-SPA DEPOT, | § | |
| LLC and US NAILS SPA, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION ON CLAIM CONSTRUCTION**

This patent infringement suit is about chairs that nail salons use to perform pedicures. Contego Spa Designs, Inc., makes spa chairs for this purpose. The chairs include a basin in which customers soak their feet in warm water during the treatment.  Water brings with it the risk of overflowing. The Contego chairs use a system of two basins to manage overflows.

T-Spa Manufacturing, LLC, also makes and sells spa pedicure chairs.  These chairs, sold under the name "KYEN," also use a system of basins to catch overflowing water.  Contego alleges that T-Spa's products infringe.  Contego sued T-Spa and US Nails Spa, Inc., a spa using T-Spa's chairs, alleging infringement of its U.S. Patent No. 9,289,353 (the '353 Patent). (Docket Entry No. 1).  Contego has since amended its complaint and dismissed US Nails Spa as a defendant. T-Spa has answered and counterclaimed. (Docket Entry No. 67).

The '353 Patent, entitled "Pedicure Basin With Overflow Protection," discloses Lan Van Ta as applicant and inventor, was issued on March 22, 2016, and is assigned to Contego.  (Docket Entry No. 39 at ¶ 16).  The '353 Patent claims a main basin in which a client's feet are submerged

and a second basin to catch overflow from the main basin. This main basin has at least a portion of its rim lowered to allow liquid to flow from the main basin into the second basin, without spilling the overflowing liquid onto the floor. The overflow can be accidental or intentionally done to lower the main basin water level to allow hotter or colder water to be added to change the water temperature, to maintain hygienic conditions, or to perform other tasks.   During the patent prosecution, the Ta chair was compared to a prior art spa chair, Tran, which contained a retractable basin.  The inventor distinguished the prior art.

The parties submitted a joint claim construction and *Markman* statement that identified five disputed terms in the '353 Patent.  (Docket Entry No. 61). The parties have briefed the claim construction issues and submitted slides showing the technology at issue.  (Docket Entry Nos. 68, 72, 73, 75, 76).  The court held a *Markman* claim construction hearing on March 18, 2024, at which counsel presented argument.  (Docket Entry No. 77).

Based on the parties' claim-construction briefs, counsels' arguments, the record, and the applicable law, the court construes the five disputed terms.  The constructions and the reasons for them are set out in detail below.

## I.     The Legal Standard for Claim Construction

The "claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  Claim terms are "generally given their ordinary and customary meaning," defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of

2

the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Claim construction begins with the claim language. *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718 Fed. App'x 965, 968 (Fed. Cir. 2018). The court looks first "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention," *Vitronics*, 90 F.3d at 1582, and construes the claim terms in the context of the surrounding claim language. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."); *accord Lexion Medical, LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011). When the words in the context of the surrounding claim language make the ordinary meaning readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

If the "ordinary and customary" meaning is unclear, the court considers "the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics*, 90 F.3d at 1582. Courts review the "specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Id*. The Federal Circuit has repeatedly stated that "claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). The specification, a "concordance for the claims," *id.* (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 397–98 (Ct. Cl. 1967)), is the "best source for understanding a technical term," *id.*

(internal quotations omitted).[1]   "[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor."   *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (the claim construction may deviate from the ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term, either in the specification or during prosecution).

"[A] court 'should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("[T]he specification is the primary source for determining what was invented and what is covered by the claims, elucidated if needed by the prosecution history.").   The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."   *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83).   The prosecution history includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or . . . to reissue a patent . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness."   *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *see also Sanofi-Aventis Deutschland GmbH v. Genentech,*

---

[1] *See also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention.").   When the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess . . . the inventor's lexicography governs."   *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

*Inc.*, 473 F. App'x 885, 888 (Fed. Cir. 2012) ("We have held that an otherwise broadly defined term can be narrowed during prosecution through arguments made to distinguish prior art.") (citing *Phillips*, 415 F.3d at 1317 ("The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.")).

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005). The doctrine applies even if the disclaimers were not necessary to make the invention patentable. *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("We find no support for [the] proposition that prosecution disclaimer applies only when applicants attempt to overcome a claim rejection. Our cases broadly state that an applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer."); *cf. Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir. 1995) ("Estoppel extends beyond the basis of patentability. . . Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel.") (citing *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165 (Fed. Cir. 1993)).[2]   Prosecution

---

[2] "There is a clear line of distinction between using the contents of the prosecution history to reach an understanding about disputed claim language and the doctrine of prosecution history estoppel which 'estops' or limits later expansion of the protection accorded by the claim to the patent owner under the doctrine of equivalents when the claims have been purposefully amended or distinguished over relevant prior art to give up scope. . . . [T]he two uses of the prosecution history must not be confused." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862 (Fed. Cir. 1991) (citations and internal quotation marks omitted); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358–59 (Fed. Cir. 2001) (distinguishing the two); *Spectrum Int'l Corp. v. Sterilite Corp.*, 164 F.3d 1372, 1378 n.2 (Fed. Cir. 1998) (same). "[J]ust as prosecution history estoppel may act to estop an equivalence argument under the doctrine of

disclaimer does not apply "where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g*, 334 F.3d at 1324; *see also id.* at 1325 ("[W]e have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer.") (citations omitted).  Only when "the patentee has unequivocally disavowed a certain meaning to obtain his patent [does] the doctrine of prosecution disclaimer attach[] and narrow[] the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324.

Courts may also "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).  Although extrinsic evidence "'can shed useful light on the relevant art,' it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 972–73 (Fed. Cir. 2011) (quoting *Phillips*, 415 F.3d at 1317).  Extrinsic evidence is "in general . . . less reliable than the patent and its prosecution history" because it is "not part of the patent" and was not created in patent prosecution: "extrinsic publications may not be written by or for skilled artisans"; and expert reports and testimony created later, for litigation, may "suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318.  A court must use "sound discretion" in admitting and using extrinsic evidence. *Id.*

---

equivalents, positions taken before the PTO may bar an inconsistent position on claim construction." *Ballard Med. Prods.*, 268 F.3d at 1359 (quoting *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998)) (alteration omitted).  When the accused infringer argues that the prosecution history results in a narrowing of a claim's scope, there is no difference, and the Federal Circuit has refused to reverse based on references to estoppel.  *See id.* at 1359 ("Because the substance of the district court's analysis was sound, we disregard the fact that the court used the term 'prosecution history estoppel' in an unconventional manner."); *Biodex Corp.*, 946 F.2d at 862–63 (observing that "Biodex is technically correct in asserting that the doctrine of prosecution history estoppel is 'irrelevant' to determination of literal claim scope" but upholding the district court because prosecution history is relevant to claim interpretation) (citation omitted).

at 1319; *see also Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984) ("A trial judge has sole discretion to decide whether or not [s]he needs, or even just desires, an expert's assistance to understand a patent.  We will not disturb that discretionary decision except in the clearest case.").

"[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.  Although a court may consider extrinsic evidence, it must not relegate the intrinsic evidence to a mere "check on the dictionary meaning of a claim term."  *Id.* at 1320–21 (noting that relying on dictionaries "too often" causes "the adoption of a dictionary definition entirely divorced from the context of the written description").  "The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  *Id.* at 1324 (citing *Vitronics*, 90 F.3d at 1582).

## II.    Analysis

The parties dispute the terms in the '353 Patent set out in **bold**:

1. A spa chair for use by a spa patient in a pedicure of the feet of the patient, the spa chair comprising:

    a seat arranged for receiving the patient in seating position thereon with the feet presented forwardly of the seat;

    a main **basin** in front of the seat and arranged such that the feet of the patient sitting on the seat are received into the main basin;

    the main **basin** having a peripheral rim for containing liquid in the main basin;

    the **main basin having at least a portion of the peripheral rim arranged at a lowered height relative to a prescribed height of the peripheral rim** so that the liquid can overflow said at least a portion of the peripheral rim in the event that the liquid reaches a depth greater than that which can be contained in the main basin;

7

a liner covering a surface of the main basin up to the peripheral rim in an installed configuration;

and a **secondary basin communicated with** the main **basin** over said at least a portion of the peripheral rim so as to collect all overflow of liquid from the main basin that is directed by said at least a portion of the peripheral rim towards the secondary basin;

whereby, in the installed configuration of the liner, said at least a portion of the peripheral rim, which is arranged at the lowered height, provides transfer of liquid out of the main **basin** by overflow while the liner prevents contact of the liquid with the main **basin** where the patient's feet are received.

2.  The spa chair of claim 1 wherein said **secondary basin** includes a drain hole.

3.  The spa chair of claim 1 wherein said liner is a flexible plastic liner.

4.  The spa chair of claim 1 wherein said liner is a hard shell liner conforming to the shape of said main basin.

5.  The spa chair of claim 1 wherein said main basin and said secondary basin share a side wall, and said at least a portion of the peripheral rim is located at said shared side wall and is lowered relative to a main portion of the peripheral rim.

6.  The spa chair of claim 1 wherein **said at least a portion of the rim is lowered relative to a main portion of the peripheral rim** and said at least a portion of the rim is located to direct liquids from said main basin to said secondary basin.

7.  The spa chair of claim 1 wherein said main basin has the peripheral rim at a common lowered height to allow the overflow liquid to overflow around the full extent of the peripheral rim and wherein the secondary basin Surrounds the full peripheral rim of the main basin.

(Docket Entry No. 39-1).

**A.  "Basin" (Claims 1, 2, 6)**

Contego argues that "basin" should be given its ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the Patent, so that no construction is needed.  In the alternative, Contego's proposed construction for "basin" in Claims 1, 2, and 6 is "container for holding liquid."  T-Spa asks the court to construe the term "basin" to mean "bowl."

At the *Markman* hearing, T-Spa stated that it was willing to accept the term "container" rather than "bowl" but maintained its argument that the claim should be construed. The court agrees that "bowl" is too narrow because it connotes a round shape.  Because of the dispute between the parties as to the scope of the term "basin[,]" (Docket Entry No. 72 at 20–21), the court construes the term as agreed by the parties.

**Construction:**  The court construes "basin" as a "container for holding liquid."

**B.  "Communicated with" (Claim 1)**

Contego argues that "communicated with" should be given its ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the Patent, with no need for construction.  In the alternative, Contego's proposed construction is "in communication with [such that liquid may flow from one element to another element]." T-Spa asks the court to construe the term as "physically connected or having a common part."

The '353 Patent provides three embodiments of the patented claims:



9



FIG. 3A



FIG. 3B



FIG. 4A

FIG. 4B

From the figures provided, each embodiment appears to have some physical connection or common part between the main basin and the secondary basin.  Figures 2A and 2B show one basin placed in front of the other with a shared wall between them.  Figures 3A and 3B show nested basins sharing the same base.  Figures 4A and 4B show one basin in front of the other with a physical ramp between the basins, that appears to be attached at one end to the main basin and at the other end to the secondary basin.

The prosecution history reveals that the phrase "communicated with" was added to the '353 Patent in order to avoid ensnaring the Tran prior art. (Docket Entry No. 72-3).   An embodiment of the Tran prior art is shown at Fig. 1A.



In explaining the differences between the Tran prior art and the '353 Patent, the inventor explained that, "[i]n Tran, the reservoir thereof which is formed by the platform 144 and upstanding walls 152 is NOT communicated with the main basin 132 Tran of at least a portion of the rim, that which is intentionally arranged at a lowered height relative to a prescribed height."

(Docket Entry No. 72-3 at 10).  Contego argues that the distinguishing feature discussed in this paragraph is the lowered portion of the main basin rim. (Docket Entry No. 73 at 12).

In the prosecution history, the inventor also acknowledges that there may be "liquid spills from the basin 132 . . . which clearly suggests any transfer of liquid over any portion of the peripheral top edge of the basin 132 of Tran to be unintentional[.]" (Docket Entry No. 72-3 at 9). Contego rightly points out that this part of the prosecution history is not concerned with the phrase "communicated with."  However, any discussion of the prior art in the prosecution history may be used to distinguish any claim from the prior art. *See SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1380 (Fed. Cir. 2021) ("An applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007)).  Figure 1A appears to show a main basin that is not physically attached to the secondary basin; instead, the main basin sits within the secondary basin, touching but not sharing or attached to a common wall or other part.  It appears from the prosecution history that, in obtaining the patent, the inventor distinguished the system depicted in Figure 1A as one in which the main basin was not "communicating" with the secondary basin through a lowered portion of the main basin's rim.

T-Spa also provides extrinsic evidence, including dictionary definitions.  "The Webster's New World Dictionary . . . defines communicate as 'to be connected.'" (Docket Entry No. 72 at 19). T-Spa also points to *Scimed Life Sys., Inc. v. Johnson & Johnson*, No. 99-CV-904, 2001 WL 36081708 (D. Del. Aug. 15, 2001), in which the court construed "communicating with" to mean "[t]o have a common part, to be connected, join." *Scimed Life Sys.* involved a patent for vascular

stents—a medical device, not a set of stationary basins.  T-Spa's extrinsic evidence, while useful, is not dispositive given the intrinsic evidence available.

Contego argues that the term "communicated with" "plainly means arranged or configured such that liquid may flow from one element (i.e., the main basin) to another element (i.e., the secondary basin)." (Docket Entry No. 68 at 20).  Counsel for Contego argued at the *Markman* hearing that the prosecution history does not show that the basins must be connected to each other, only that the basins must be close enough so that water can flow from one to the other without spilling. (Docket Entry No. 77)  Counsel for Contego argued that in Figures 4A and 4B, the parts labelled 550 and 520 did not have to be physically connected or attached to each other, but they do have to be close enough to permit the secondary basin to capture water flowing from the lowered portion of the main basin without having some of the water spill onto the floor.

The court agrees that the purpose of the communication between the basins is to allow water to flow from the main basin to be collected in the secondary basin. Under Contego's proposed construction, the flow of liquid from one basin to the other without spilling is the communication between the two basins, but this does not fully address the prosecution history. T-Spa's proposed construction is too narrow, because it does not encompass the situation in which a lowered portion of the main basin rim allows liquid to flow from the main basin to a secondary basin that is right next to, but not physically connected to, the main basin.  Nor does T-Spa's proposed construction encompass a situation in which a ramp or bridge is attached to the main basin and hovers slightly above the secondary basin, allowing water to flow from the main basin down the ramp to the secondary basin.  Such a ramp or bridge need not be physically connected to the secondary basin, but the space between the end of the ramp or bridge must be close enough to

the second basin to allow water to flow into the secondary basin without spilling.  Neither proposed construction both accurately describes the claim and is consistent with the prosecution history.

**Construction:**  The court construes "communicated with" as "connected through a configuration that allows liquid to flow from a main basin into a secondary basin without spilling."

### C.  "Secondary basin" (Claims 1, 2, 6)

Contego argues that "secondary basin" should be given its ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the '353 Patent.  In the alternative, Contego's proposed construction for "secondary basin" in Claims 1, 2, and 6 is "container other than the main basin for holding liquid."  T-Spa asks the court to construe the term "secondary basin," and its proposed construction is a "bowl that is adapted to receive intentional and unintentional overflow of liquid."

The "secondary basin" discussed in the patent is "communicated with" the main basin for the purpose of collecting water overflowing through a specified part of the main basin. The patent specifies the use of the secondary basin in the remainder of the paragraph.  Paragraph 6 of Claim 1 reads: "and a secondary basin communicated with the main basin over said at least a portion of the peripheral rim so as to collect all overflow of liquid from the main basin that is directed by said at least a portion of the peripheral rim towards the secondary basin[.]" (Docket Entry No. 39-1).

T-Spa argues that Contego's proposed construction "is inconsistent with the intrinsic evidence," including statements made during the '353 Patent prosecution. (Docket Entry No. 72 at 12). T-Spa states that "[i]t is clear from Contego's statements made during the prosecution of the '353 Patent that the secondary basin is adapted to receive intentional and unintentional overflow of liquid." (*Id.* at 13).  In support, T-Spa points to the prosecution history, stating that "Contego argued during prosecution that the prior art failed to disclose a secondary basin that is

adapted to receive unintentional overflow and intentional overflow[.]" (*Id.* at 12).  The prosecution history shows that the Tran prior art included a "secondary basin," which was distinguished from the secondary basin in the '353 Patent by the different use of the secondary basin in the '353 Patent. (Docket Entry No. 72-3 at 9).

The Patent claims the use of a secondary basin—to "collect all overflow of liquid from the main basin that is directed by said at least a portion of the peripheral rim [of the main basin] towards the secondary basin."  (Docket Entry No. 39-1 at 8).  The claim is not limited to a basin that is "adapted" for this purpose.  And construing "secondary basin" as T-Spa suggests would mean that the Tran prior art does not have a secondary basin, which is inconsistent with the evidence.  The term "secondary basin" cannot be construed according to one particular type of secondary basin, as that would overly constrict the scope of the term; limiting a secondary basin to "holding" liquid, as Contego proposes, is also incomplete.

**Construction:**  The court construes "secondary basin" as a "container, other than the main basin, that receives and holds liquid from the main basin."

## D.  "Main basin having at least a portion of the peripheral rim arranged at a lowered height relative to a prescribed height of the peripheral rim" (Claim 1)

Contego argues that the phrase "at a lowered height relative to a prescribed height of the peripheral rim" should be given its ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the Patent.  In the alternative, Contego's proposed construction for the phrase in Claim 1 is "[a portion of the peripheral rim of the basin is] at a lowered height relative to a set height of the remainder of the peripheral rim."  T-Spa asks the court to find that the phrase "the main basin having at least a portion of the peripheral rim arranged at a lowered height relative to a prescribed height of the peripheral rim" is indefinite and therefore void.  T-Spa argues that the unspecified height makes "the phrase unclear as to what heights the

main basin is at, and therefore when a product infringes" and argues that "there are no clear logical readings of the above phrase that would shed light on the meaning of the phrase." (Docket Entry No. 72 at 25).

Title 35 U.S.C. § 112(2) provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe. That determination requires a construction of the claims according to the familiar canons of claim construction." *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1340 (Fed. Cir. 2003) (quoting *All Dental Prodx, LLC v. Advantage Dental Prods.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002)). "One of those canons is that claims are construed as one skilled in the art would understand them in light of the specification of which they are a part." *Id.* at 1340–41 (citing *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575 (Fed. Cir. 1986)).

An issued patent comes with a statutory presumption of validity under 35 U.S.C. § 282. "[A]n alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence, as well as the initial burden of going forward with evidence to support its invalidity allegation." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) (citing *Tech. Licensing Corp.*, 545 F.3d at 1327). A determination of claim indefiniteness is a legal conclusion reached by the court performing its duty as the "construer of patent claims." *Tech. Licensing Corp.*, 545 F.3d at 1338 (quoting *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed.

16

Cir. 1998)). "To the extent there are any factual findings upon which a trial court's indefiniteness conclusion depends, they must be proven by the challenger by clear and convincing evidence." *Id.* (citing *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003)).

T-Spa argues that because there are a "vast range of possible heights" and a "set height" is not defined, Claim 1 is indefinite. (Docket Entry Nos. 72 at 26–27, 77). Counsel for Contego responds that Claim 1 simply states that no matter what the height of the main basin rim is, part of that rim is lower than the rest of the rim. The lower part of the rim is the part over which water from the main basin is directed to flow over into the secondary basin. One part of the main basin rim—the part of the rim over which the overflow is directed—is lower than the rest of the rim. The court agrees with Contego.

The leading case for determining indefiniteness is *Orthokinetics Inc. v. Safety Travel Chairs, Inc*., 806 F.2d 1565 (Fed. Cir. 1986). The patent in *Orthokinetics* involved pediatric wheelchairs designed to make it easier to load and unload a child from a vehicle. *Id.* at 1568. The disputed claim described a wheelchair "wherein said front leg portion is *so dimensioned* as to be insertable through the space between the doorframe of an automobile and one of the seats thereof." *Id.* (emphasis added). The Federal Circuit held that the term "so dimensioned" was sufficiently definite, reasoning that "one of ordinary skill in the art would easily have been able to determine the appropriate dimensions" by looking at the space available in the automobile and the size of the chair. *Id.* at 1576. While the term "so dimensioned" could have varying meanings based on automobile shapes and sizes, the meaning in any specific case was objectively identifiable to one skilled in the art. "The phrase 'so dimensioned' [was] as accurate as the subject matter permits, automobiles being of various sizes." *Id.*

The disputed term means that a main basin will have a rim at a certain height specific to that basin, and part of that basin's rim will be of a lower height.  The precise heights of the main basin and of the lower part of that basin depend on the size and configuration of the spa chair. The paragraph containing the disputed term states that the rim is lowered "so that the liquid can overflow said at least a portion of the peripheral rim in the event that the liquid reaches a depth greater than that which can be contained in the main basin[.]" (Docket Entry No. 39-1).  The prosecution history clarifies that the rim of the main basin "is arranged so that the liquid contained therein can overflow this lowered portion of the peripheral rim" into the secondary basin. (Docket Entry No. 72-2 at 9).  The description of the portion of the rim lowered relative to the remainder of the rim is not indefinite. The lowered rim allows liquid in the main basin to flow into the secondary basin once the liquid in the main basin is deeper than the lowered part of that basin can hold.

The '353 Patent contains figures that have the lowered part of the main basin rim connected to or so close to the secondary basin to permit water to flow from the main basin into the secondary basin without spilling.  The precise height of the lowered part of the main basin rim and of the rest of that rim depend on the configuration. (*See supra* Part II.B).  "Some modicum of uncertainty, the Court has recognized, is the price of ensuring the appropriate incentives for innovation." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) (internal quotations omitted). The disputed term is not indefinite.

**Construction:** Although Contego argues that this term does not need construction, T-Spa's claim that the term is indefinite suggests that the term requires construction in order to provide further definition to the term. The court construes "at a lowered height relative to a

prescribed height of the peripheral rim" to mean a "[a portion of the peripheral rim of the main basin is] at a lowered height relative to the height set for the remainder of the peripheral rim."

### E.   "Said at least a portion of the rim is lowered relative to a main portion of the peripheral rim" (Claim 6)

Contego argues that the phrase "said at least a portion of the rim is lowered relative to a main portion of the peripheral rim" should be given its ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the Patent.  In the alternative, Contego's proposed construction for the phrase in Claim 1 is "said lowered portion of the peripheral rim is lowered relative to the majority of the peripheral rim."  T-Spa asks the court to find that the phrase is indefinite.

T-Spa argues that the phrase is "littered with ambiguity and vagueness" because it is unclear "what entails the 'main portion of the peripheral rim.'" (Docket Entry No. 72 at 28).  At the *Markman* hearing, counsel for T-Spa argued that the location of the main portion was also unclear, and that Contego's proposed construction of "majority" remained unclear.  Counsel for Contego responded that claim definiteness does not require more specification of how much of the rim constituted the "main portion" that was higher than the rest of the rim.  Contego also noted that many potential designs of that element were possible. (Docket Entry No. 77).

T-Spa points to the embodiment depicted in Figure 3A and 3B of the '353 Patent (*see supra* Part II.B) as "compound[ing] the ambiguity[.]" (Docket Entry No. 72 at 28).  The '353 Patent states that in these figures, "the entire rim of the main basin can be considered lowered" and "the height of the secondary basin can be higher or lower than the height of the rim of the main basin." (Docket Entry No. 39-1).  But this is not in conflict with Claim 6, which provides one embodiment of the '353 Patent.  Indeed, Figure 3A and 3B appear to show an embodiment of Claim 7, which states: "The spa chair of claim 1 wherein said main basin has the peripheral rim at a common

lowered height to allow the overflow liquid to overflow around the full extent of the peripheral rim and wherein the secondary basin surrounds the full peripheral rim of the main basin." (*Id.*).

The ambiguities alleged by T-Spa do not lead to indefiniteness.  As Contego explained, Claim 6 describes a basin design like that shown in Figures 2A, 2B, 4A, and 4B, in which more than half of the peripheral rim is at a raised height, and less than half of the peripheral rim is at a relatively lowered height.

**Construction:**  Although Contego argues that this term does not need construction, T-Spa's claims that the term is indefinite suggest that the term requires construction in order to provide clarity as to the meaning of "main portion" in particular. The court construes the phrase "said at least a portion of the rim is lowered relative to a main portion of the peripheral rim" to mean "a portion of the peripheral rim is lowered relative to the majority of the peripheral rim."

## III.    Conclusion

The court adopts the following constructions for the five disputed terms in the '353 Patent for a spa chair with overflow protections:

1. "Basin" is construed as "a container for holding liquid."

2. "Communicated with" is construed as "connected through a configuration that allows liquid to flow from a main basin into a secondary basin without spilling."

3. "Secondary basin" is construed as a "container, other than the main basin, that receives and holds liquid from the main basin."

4. "At a lowered height relative to a prescribed height of the peripheral rim" is construed as "[a portion of the peripheral rim of the main basin is] at a lowered height relative to the height set for the remainder of the peripheral rim."

5. "Said at least a portion of the rim is lowered relative to a main portion of the peripheral rim" is construed as "a portion of the peripheral rim is lowered relative to the majority of the peripheral rim."

SIGNED on March 27, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge